[No. A049899. First Dist., Div. Two. Apr. 29, 1992.]

MICHAEL M., Plaintiff and Appellant, v.
GIOVANNA F. et al., Defendants and Respondents.

**COUNSEL**

Ronald B. Bass for Plaintiff and Appellant.

Anderson & Watt and Terrance W. Andrews for Defendants and Respondents.

## OPINION

**BENSON, J.—** Michael M. (Michael) appeals the dismissal of his paternity action brought against respondents Giovanna F. (Giovanna) and Matthew F. (Matthew) (collectively, respondents) after the trial court sustained respondents' demurrer to his second amended complaint without leave to amend.[1] Michael contends portions of the Uniform Parentage Act (UPA) as adopted in California (Civ. Code, § 7000 et seq.) are unconstitutional as applied to him because they deny him standing to maintain an action to establish paternity of his child, Brian F. (Brian). He argues the denial amounts to a deprivation of due process and of the equal protection of the laws, and in addition asserts it violates his privacy rights under the California Constitution.

We find Michael has alleged facts that if proven, would establish a protected federal due process interest in an opportunity to establish his paternity, and an opportunity to show that the formation of a parental relation between him and Brian by means of appropriate visitation or custody orders would be in Brian's best interests. We find that on the facts of this case, the state's interest in enforcing the standing provisions of the UPA are outweighed by Michael's due process interest. We conclude that as applied to Michael, the UPA's standing provisions are an unconstitutional infringement on Michael's substantive due process rights. In view of our conclusion, we do not reach his claim that the denial of standing deprives him of equal protection, nor do we reach his claims based on state law.

We reverse and remand for further proceedings at which Michael may attempt to establish his paternity and that he should be entitled to visitation or custody rights.

### I.

### FACTS AND PROCEDURAL HISTORY

 We assume the facts as pleaded in the complaint are true, and draw all reasonable inferences from those facts in Michael's favor. (*Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 210 [266 Cal.Rptr. 638, 786 P.2d 365]; *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88,

---

[1]Michael actually appealed from the order sustaining the demurrer. The order is not appealable, but we will deem it to incorporate an order of dismissal, and interpret Michael's notice of appeal as taken from that order. (*Beazell* v. *Schrader* (1963) 59 Cal.2d 577, 580 [30 Cal.Rptr. 534, 381 P.2d 390].)

We use the first names of the parties to protect their identities; no disrespect is intended. (See *Adoption of Matthew B.* (1991) 232 Cal.App.3d 1239, 1251, fn. 1 [284 Cal.Rptr. 18].)

468 P.2d 216].) Accordingly, our summary of fact is taken from Michael's second amended complaint.

Michael and Giovanna, then both single, lived together periodically beginning in 1986. On October 6, 1988 they became engaged to be married. During their engagement, a child, later named Brian, was conceived. In December 1988, after Brian was conceived, Giovanna broke off the engagement. Before the engagement was broken, Giovanna often told Michael she was pregnant with their child. In March 1989, Michael wrote to Giovanna to inquire whether she had confirmed her pregnancy, but received no reply. In the same month, Giovanna married Matthew. Michael did not learn of the marriage until July 1989, when he saw Giovanna, who appeared to be in the last weeks of a full term pregnancy. After seeing Giovanna, Michael sought to speak with her regarding her pregnancy. She refused and eventually obtained an order restraining Michael from further contact with respondents.

On August 4, 1989, Matthew contacted Michael and informed him that Giovanna had given birth to a child, but refused to tell him the birth date or name of the baby. Michael explained he wanted to know whether the child was his because, if it was, he wanted to participate in its upbringing and to contribute to its support. Michael asked permission to visit Brian, but respondents refused. On August 9, 1989, respondents obtained a permanent order from the Contra Costa Superior Court enjoining Michael from further contact with them. On the same day, Michael filed his complaint to declare paternity.

After demurrers to the complaint and the first amended complaint were sustained with leave to amend, Michael filed a second amended complaint in which he requested a declaration of paternity and joint physical and legal custody of Brian. On August 23, 1989, he sent respondents a check for Brian's support. The check was returned uncashed and Michael then established a bank account for Brian's benefit.

The respondents' demurrer to the second amended complaint was sustained without leave to amend on the ground that Michael lacked standing to maintain the action. This appeal followed.

## II.

### STATUTORY SCHEME

Though Michael did not expressly style his suit as such, the parties and the court below were agreed that Michael's action was brought under the

UPA, enacted in California as Civil Code sections 7000-7021.[2] ■ The UPA provides a comprehensive scheme for judicial determination of paternity, and was intended to rationalize procedure, to eliminate constitutional infirmities in then existing state law, and to improve state systems of support enforcement. (9B West's U. Laws Ann. (1987) U. Parentage Act, comrs. note, pp. 287-290; Legis. Counsel's Dig., Sen. Bill No. 347, 2 Stats. 1975 (Reg. Sess.) Summary Dig., p. 344.) Relevant here, the UPA expressly specifies those persons who have standing to sue for a declaration of paternity. (Civ. Code, § 7006 [authorizing actions declaring existence or nonexistence of paternal relation].)[3] Under the statutory scheme, the standing of the various potential parties to bring such an action depends in large part on the existence or nonexistence of a man who is presumed to be the child's father under the various provisions of Civil Code section 7004.[4] However, it is unnecessary to discuss these rather complex provisions in detail. ■ As Michael contends in this appeal, and as respondent concedes, absent adoption proceedings,[5] a biological father has no standing to sue for a declaration of paternity so long as a different presumed father exists and the biological father has been unable to take the child into his home and hold it out as his own. Because Matthew and Giovanna were married when Brian was born, Matthew is the presumed father. (Civ. Code, § 7004, subd. (a)(1).) Thus, Michael lacks standing under the UPA to bring an action either to establish his paternity, or to rebut the presumption that Matthew is the child's father. This lack of standing gives rise the issue now before us: whether the statutory scheme as applied to Michael impermissibly infringes on his constitutional rights.

### III.

### DISCUSSION

We begin our discussion with a brief review of the general principles we apply.

■ There are two species of due process rights. First, a right to fair procedure where the state proposes to interfere with or impair constitutionally protected interests; and second, a substantive right to be free of governmental interference with fundamental constitutional rights absent some compelling reason for interference. (See, e.g., *Anti-Fascist Committee* v. *McGrath*

---

[2]As noted, we refer to the Uniform Parentage Act as enacted in California as the UPA. We refer to specific sections of the UPA by their California designations, though the numeration of the UPA as drafted by the Commissioners on Uniform State Laws differs from that of the Civil Code. (See 9B West's U. Laws. Ann. (1987) U. Parentage Act, pp. 287-345.)

[3]The text of Civil Code section 7006 appears in the appendix to this opinion, *post.*

[4]The text of Civil Code section 7004 appears in the appendix, *post.*

[5]A biological father may bring an action to establish his paternity where the mother puts the child up for adoption. (Civ. Code, § 7006, subd. (d).) In this situation, the biological father's right of action exists whether or not a different presumed father exists.

(1951) 341 U.S. 123, 168 [95 L.Ed. 817, 852, 71 S.Ct. 624] (conc. opn. of Frankfurter, J.) [right to fair procedure]; *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 485 [14 L.Ed.2d 510, 515, 516, 85 S.Ct. 1678] [unnecessarily broad invasion of fundamental right prohibited].) ▮ Both species are invoked here. First, because Michael has been denied standing to sue in the first instance, he has been deprived of any hearing at which he may be heard to assert whatever rights he may have to form a parental relation with Brian. (See *Stanley* v. *Illinois* (1972) 405 U.S. 645, 657 [31 L.Ed.2d 551, 562, 92 S.Ct. 1208] [unwed father entitled to hearing on question of parental fitness].) Second, his claim that he has such a right is based on a recognized substantive due process right to be free of state interference with personal relations between family members. (See *In re Lisa R.* (1975) 13 Cal.3d 636, 648 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017]; *Michael H.* v. *Gerald D.* (1989) 491 U.S. 110, 124 [105 L.Ed.2d 91, 106-107, 109 S.Ct. 2333] [plur. opn. of Scalia, J.].)

Michael's claim that he has been deprived of due process depends on the existence of a constitutionally protected interest in a biological father's parental relation with his offspring. Though there is no clear agreement on the exact boundaries of such a right, the extremes are well defined. First, there is no constitutionally protected interest in a parental relation where the basis for that relation is the genetic or biological connection created by impregnation alone. (*Lehr* v. *Robertson* (1983) 463 U.S. 248, 261 [77 L.Ed.2d 614, 626, 103 S.Ct. 2985]; and see *In re Lisa R.*, *supra*, 13 Cal.3d at p. 649.) " 'Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.' " (*Lehr, supra*, 463 U.S. at p. 260 [77 L.Ed.2d at p. 626], quoting *Caban* v. *Mohammed* (1979) 441 U.S. 380, 397 [60 L.Ed.2d 297, 310, 99 S.Ct. 1760] (disn. opn. of Stewart, J.).) Where an unwed father fails to demonstrate any interest in forming a relationship with a child from the beginning, any rights conferred by the biological connection are lost. Thus, in *Lehr*, where the alleged biological father had shown no inclination to establish his paternity despite the existence of a statutory procedure by which he could have done so, he had no protected interest in his paternal relationship with his child, and was not harmed by the state's failure to notify him of adoption proceedings. (*Lehr, supra*, 463 U.S. at pp. 255, 261 [77 L.Ed.2d at pp. 622-623, 626]; cf. *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 838 [4 Cal.Rptr.2d 615] [where unwed father had promptly demonstrated his intent to form a relationship, his potential relationship with the child was "worthy of constitutional protection"].) At the other end of the spectrum, an existing parental relationship established between an unwed biological father and his child or children is entitled to the same constitutional protections as a parent-child relationship formed within a marriage.

(See *Stanley* v. *Illinois, supra*, 405 U.S. at p. 657 [31 L.Ed.2d at p. 562]; *Michelle W.* v. *Ronald W.* (1985) 39 Cal.3d 354, 362-363 [216 Cal.Rptr. 748, 703 P.2d 88] [acknowledging existence of limited due process interest]; *In re Lisa R., supra*, 13 Cal.3d at p. 648 [analyzing *Stanley* ]; *Adoption of Matthew B.* (1991) 232 Cal.App.3d 1239, 1273 [284 Cal.Rptr. 18] [biological father's genetic connection together with evidence of formation of relationship would give rise to due process right to seek declaration of paternity].)

Though the United States Supreme Court has not yet spoken directly on the issue, with our Supreme Court's decision in *Adoption of Kelsey S., supra*, 1 Cal.4th at page 838, it is established in California that even though there may be no *existing* relationship, as in *Stanley* and its progeny, an unwed biological father who attempts to create a relationship with his child promptly upon the child's conception or birth has a constitutionally protected interest in that relationship. In *Kelsey S.*, a child was born to unwed parents in 1988. The biological father was aware the mother wanted to place the child for adoption, and objected because he wanted to raise the child himself. Two days after the birth, he filed an action under the UPA to establish a relationship with the child. The court issued an order staying the adoption and awarded custody to him. Several days later, the prospective adoptive parents filed an adoption petition under Civil Code sections 226 and 7004, in which they alleged only the mother's consent was required because there was no presumed father. They then filed a petition under Civil Code section 7017 to terminate the biological father's parental rights. After consolidation of the adoption and paternity proceedings and hearing on the child's best interests, the trial court found those interests required termination of the biological father's rights, and ordered accordingly. The Court of Appeal affirmed the judgment, but the Supreme Court reversed.

The Supreme Court held a biological father's federal constitutional rights are infringed by a statutory procedure which allows the child's mother to unilaterally preclude him from exercising a right otherwise granted to a presumed father to withhold consent to adoption. (*Adoption of Kelsey S., supra*, 1 Cal.4th at p. 849.) The court found a biological unwed father has a "constitutionally cognizable *opportunity interest* in developing a relationship with his child." (*Id.* at p. 844, italics added.) Based on that finding, it concluded that to the extent "the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby [allow] the state to terminate his parental rights on nothing more than a showing of the child's best interest," they violated federal constitutional guarantees. (*Id.* at p. 849.)

As is evident, the issue in *Kelsey S.* is closely related to the problem here. Like the biological father in *Kelsey S.*, Michael has promptly

taken every step open to him to form a relationship with his child. Under the reasoning of *Kelsey S.* and the federal precedents it discusses, his actions have preserved his "opportunity interest" in being a parent. That interest is protected as a matter of due process. However, the recognition that Michael has a protected interest does not end our inquiry, nor does *Kelsey S.* or the cases it discusses resolve the issue here.

*Kelsey S.* and the line of cases on which it relies arise out of adoption proceedings initiated by a biological mother, in which a biological father raises objections to the termination of his parental rights. (See *Lehr* v. *Robertson, supra,* 463 U.S. at p. 250 [77 L.Ed.2d at pp. 619-620] [father objected to lack of notice of adoption proceeding]; *Quilloin* v. *Walcott* (1978) 434 U.S. 246, 247 [54 L.Ed.2d 511, 515, 98 S.Ct. 549] [father objected to adoption by husband of mother]; *Caban* v. *Mohammed, supra,* 441 U.S. 380, 383-384 [60 L.Ed.2d at pp. 301-302] [father objected to adoption of children by third parties]; *Matter of Raquel Marie X.* (1990) 76 N.Y.2d 387, [559 N.Y.S.2d 855, 559 N.E.2d 418, 420] [in consolidated cases, fathers objected to adoptions].) As the court noted in *Matter of Raquel Marie X.,* in the adoption context the recognition of a biological father's opportunity interest does not conflict with the recognized countervailing state interest in family integrity, stable family relations, and the preservation of related traditional values. (See, e.g., *Michael H.* v. *Gerald D., supra,* 491 U.S. at p. 124 [105 L.Ed.2d at pp. 106-107] [plur. opn. of Scalia, J., arguing strength of traditional value placed on stable two-parent marriage families]. "[A]ny connection between [such values] and the means chosen to promote [them] disappears with the realization that the issue arises only when, over the father's objection, the mother has surrendered the newborn infant and consented to adoption." (*Matter of Raquel Marie X., supra,* 76 N.Y.2d at p. 406 [559 N.E.2d at p. 427].) Because the placement for adoption is itself an acknowledgment that any then-existing family unit has dissolved, courts considering a biological father's right to withhold consent have not considered the balance between those rights and the state's interest in preserving the integrity of existing families.

Here, in contrast, Brian has not been placed for adoption. Rather, the mother and her husband have, like Michael, done everything in their power to establish a stable traditional family unit. Thus, our consideration of Michael's challenge to the statutory scheme which denies him standing to establish his paternity does not occur in a vacuum. We must balance his acknowledged due process interest in the opportunity to form a parental relationship against the countervailing interests of Matthew and Giovanna, and those of the state, in preserving family integrity. Though no California case has discussed the issue in the precise factual context before us, the

importance of that state interest and the manner in which it should be balanced against that of a biological father is by no means unknown territory.

■ Where a child is conceived during and born into an existing marriage, but has been fathered by a man outside the marriage, the application of both traditional common law and modern constitutional principle have almost universally produced the same result; the biological father may be barred by the state from developing a relationship with the child against the married parents' wishes. The traditional method of achieving this result was the conclusive presumption of paternity, which no one could challenge, least of all the biological father. So long as it is physically possible for the child to have been conceived while the marriage partners were cohabiting, the presumption applies. (See, e.g., *Michael H.* v. *Gerald D., supra,* 491 U.S. at pp. 124-126 [105 L.Ed.2d at pp. 106-108] [plur. opn. of Scalia, J., discussing historical origins of conclusive presumption of legitimacy]; *Estate of Cornelious* (1984) 35 Cal.3d 461, 464 [198 Cal.Rptr. 543, 674 P.2d 245] [noting origin of presumption in Roman law]; *Kusior* v. *Silver* (1960) 54 Cal.2d 603, 609-611 [7 Cal.Rptr. 129, 354 P.2d 657] [discussing California statutory conclusive presumption].)

The presumption was designed to avoid imposing the legal and social stigma of illegitimacy on children born to married persons, and to prevent the added expense to the state of providing for abandoned children. (*Michael H.* v. *Gerald D., supra,* 491 U.S. at p. 125 [105 L.Ed.2d at p. 107]; *Estate of Cornelious, supra,* 35 Cal.3d at p. 465.) Though this case does not directly involve the application of the conclusive presumption,[6] that part of the statutory scheme of the UPA providing for presumptions of paternity and specifying the circumstances under which those presumptions may be challenged absolutely bars Michael from either establishing his own paternity or challenging that of the presumed father. Thus, the UPA operates in this case in the same manner as the conclusive presumption of paternity. Though few authorities have discussed this aspect of the UPA, the clash between a biological father's constitutionally protected parental interest and the operation of a conclusive presumption of paternity in another has been considered by numerous courts in the conclusive presumption cases. Because we must ultimately decide whether the absolute bar on Michael's action can pass constitutional muster, we review the manner in which these interests have been balanced where the conclusive presumption has been applied.

The interests of the state and of the biological father are well defined. First, following the United States Supreme Court's decision in *Stanley* v.

---

[6]The conclusive presumption does not apply where, as here, the child is conceived out of wedlock. (Evid. Code, § 621, subd. (a); see *Michelle W.* v. *Ronald W., supra,* 39 Cal.3d at p. 359.)

*Illinois, supra,* 405 U.S. 645, it has become established in California as in other jurisdictions that a biological father has a substantive due process right to a parental relationship with his offspring. (*Adoption of Kelsey S., supra,* 1 Cal.4th at p. 838; *Michelle W. v. Ronald W., supra,* 39 Cal.3d at p. 362; see generally, Annot., Who May Dispute Presumption of Legitimacy of Child Conceived or Born During Wedlock (1979) 90 A.L.R.3d 1032 [collecting cases].) Where state law impinges on the biological father's substantive right, we are to apply traditional substantive due process principles; we must balance the father's interest against those of the state. (*Michelle W., supra,* 39 Cal.3d at pp. 361-362; *In re Lisa R., supra,* 13 Cal.3d 636, 648; see, e.g., *Matter of Raquel Marie X., supra,* 76 N.Y.2d 387 [559 N.Ed.2d 418]; *A v. X, Y, and Z* (Wyo. 1982) 641 P.2d 1222, 1227; *Finnerty v. Boyett* (La.Ct.App. 1985) 469 So.2d 287, 292.)

The nature of the state interest is also established. The state has a continuing interest in the welfare of the child, and in "familial stability." (*Michelle W. v. Ronald W., supra,* 39 Cal.3d at p. 363; *Estate of Cornelious, supra,* 35 Cal.3d at pp. 464-465; *In re Lisa R., supra,* 13 Cal.3d at p. 650 [policy against "impugning a family unit"].) The application of these principles in *Michelle W.* illustrates the point. In *Michelle W.,* a child, Michelle, was born to Ronald W. and Judith W., who had then been married for approximately nine years. (*Michelle W., supra,* 39 Cal.3d at p. 358.) Several years later, the parents separated and divorced. (*Ibid.*) Three years later, the mother married Donald R., who brought an action to prove his paternity of Michelle. (*Id.* at p. 359.) Apparently, it was stipulated that Donald R. was Michelle's biological father, and that he had not participated in Michelle's support or upbringing prior to his marriage to her mother. (*Ibid.*) On these facts the trial court found that Evidence Code section 621[7] forced the conclusive presumption that Ronald W. was Michelle's father, and entered judgment accordingly. Our Supreme Court affirmed. In the portion of its discussion relevant to this case, it rejected biological father Donald R.'s due process challenge to the statutory conclusive presumption. (*Michelle W., supra,* 39 Cal.3d at pp. 360-363.) Analyzing *Stanley v. Illinois, supra,* 405 U.S. 645, *Quilloin v. Walcott, supra,* 434 U.S. 241, *Lehr v. Robertson, supra,* 463 U.S. 248, and *In re Lisa R., supra,* 13 Cal.3d 636, the court determined that although the biological father had an "abstract interest in establishing paternity," the state's interest in "familial stability and the welfare of the

---

[7]Evidence Code section 621 provided in relevant part: "(a) [e]xcept as provided in subdivision (b), the issue of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage." The statute provided for rebuttal of the presumption by the mother or her husband within two years of birth. (*Michelle W., supra,* 39 Cal.3d at p. 358, fn. 1.) The present version of Evidence Code section 621 is not significantly different for our purposes; the biological father has no standing to rebut the presumption.

child" outweighed that interest. (*Michelle W., supra,* at pp. 362, 363.) *Michelle W.* stands for the proposition that a biological father who seeks to establish his paternity of a child conceived and born to married parents must show more than the dissolution of that family and his biological connection to the child. Thus, where such a father has not actually formed a parental relationship with the child, he does not have a sufficient interest to overcome that of the state, at least where Evidence Code section 621 is applicable. We believe that principle extends as well to those cases in which the biological father has, as in *Adoption of Kelsey S., supra,* 1 Cal.4th 816, only attempted to form a relationship with the child. Thus, were Evidence Code section 621 applicable here, we would find Michael's action must fail based on the principles expressed in *Michelle W.*

However, there is a significant difference between this case and those in which the conclusive presumption of paternity applies. Here, Giovanna's marriage to Matthew occurred after Brian was conceived, and after both Giovanna and Michael were aware they had conceived a child. Under these circumstances, we believe the state's interest in preserving family integrity is significantly reduced, since the marriage family did not exist when the child was conceived. Where the marriage partners are joined, both knowing that the child is in utero and there is a different biological father in existence, we find no tenable basis on which to find a threat to the unity of the family flowing from the biological father's prompt attempt to establish a relationship with the child. Indeed, we find the situation analogous to that in which a divorced parent retains joint custody or visitation rights after the remarriage of his or her former partner, a situation in which the state has determined any threat to family integrity is outweighed by other considerations. (See Civ. Code, § 4600 [custody orders]; see *Finnerty* v. *Boyett, supra,* 469 So.2d at pp. 289, 292 [on facts similar to those here, court finds little or no threat to family integrity].) That common situation offends no public policy which would protect the second marriage from interference by the divorced parent. Similarly here, allowing Michael to exercise the opportunity interest he has secured by his prompt action does not offend the state's interest in preserving the integrity of an existing family against challenge by third persons.[8] (Cf. *Fuss* v. *Superior Court* (1991) 228 Cal.App.3d 556, 562-563 [279 Cal.Rptr. 46] [noting in dictum that due process would require

---

[8]We reject Matthew and Giovanna's reliance on the United States Supreme Court's decision in *Michael H.* v. *Gerald D., supra,* 491 U.S. 110, in which Justice Scalia announced that a biological father has no liberty interest strong enough to overcome a state's interest in preserving the integrity of the family, and rejected any other reading of *Stanley* v. *Illinois, supra,* 405 U.S. 645 and its progeny as incorrect. (*Michael H., supra,* 491 U.S. at pp. 123, 129 [105 L.Ed.2d at pp. 105-106, 109-110].) *Michael H.* is inapposite because it involved a child both conceived and born during marriage. However, even assuming that Justice Scalia's opinion should control in the different factual context presented here, we conclude his opinion

standing in biological father where mother married after paternity action filed, but before child was born].) We therefore hold that where unwed parents conceive, and the mother marries another before the birth of the child, the biological father's substantive due process right to a relationship with his child requires that he be allowed standing under the UPA to attempt to establish his paternity of the child, so long as he has promptly taken sufficient steps to preserve his interest. (See *Adoption of Kelsey S., supra,* 1 Cal.4th at p. 849 [discussing duty of biological father if opportunity interest is to be preserved].) In view of our conclusion, we do not reach Michael's claims based on equal protection, or those based on the California Constitution.[9]

Finally, we discuss the limitations of our holding. First, it is limited to the precise factual situation alleged by Michael. Michael has alleged facts, which if proved, would establish his due process opportunity interest to form a relationship with Brian. We find that on these facts, his interest outweighs that of the state in enforcing the standing provisions of the UPA, and that he must be accorded standing to bring an action to establish his paternity. We note, however, that even if his paternity is established, the nature of his relationship to the child as ordered by the court is to be governed by the best interests of the child. (Civ. Code, § 7010, subd. (c)(1).) We do not attempt here to decide what those interests may be, but emphasize the discretion of the trial court to protect those interests by proper orders.

The judgment is reversed.

Kline, P. J., and Peterson, J., concurred.

---

on this point was not the opinion of a majority of the court. In dissent, Justices Brennan, Marshall, Blackmun and White would have found Michael D. had at least a potential protected liberty interest, and in a concurring opinion, Justice Stevens agreed, but found that interest adequately protected by Michael H.'s right to seek visitation under the Family Law Act. (*Id.* at pp. 133, 143-146, 157 [105 L.Ed.2d at pp. 112-113, 119-121, 128].) Thus, a majority of the court did not agree that a biological father could never obtain a constitutionally protected interest in a parental relationship with a child born into another's marriage. We therefore do not find *Michael H.* controlling here.

[9]Nor do we reach Michael's suggestion we could order visitation pendente lite, and on that basis grant him standing under the provision that he may be presumed Brian's father by taking him into his home and holding him out as his child. (Civ. Code, § 7004, subd. (a)(4).) In view of our Supreme Court's rejection of the very similar notion of "constructive receipt" in *Adoption of Kelsey S., supra,* 1 Cal.4th at pages 829-830, the suggestion is of dubious merit in any case.